Eleanor L. Ross, United States District Judge
This matter is before the Court on Plaintiff's Motion for Summary Judgment [Doc. 18] and the United States of America's Motion for Summary Judgment [Doc. 23].
I. Background
A. Procedural History and Facts
Plaintiff Steven J. Myers filed the instant complaint[1] asking the Court to order a refund of certain assessed tax penalties paid by Plaintiff. Compl. [Doc. 1]. The Government answered and counterclaimed against Plaintiff for the taxes it contends Plaintiff owes. Answer [Doc. 6]. The Internal Revenue Service assessed against Plaintiff a trust fund penalty for the payroll taxes of the employees of two corporations during the third and fourth quarters of 2009. Compl. at ¶ 17. Plaintiff protested the proposed assessment. Id. at ¶ 18. On December 9, 2013, the IRS Appeals office issued a Notice of Determination. Id. at ¶ 19. On January 8, 2014, the IRS assessed against Plaintiff the trust fund penalty for unpaid payroll taxes. Id. at ¶ 20.
Media and newspaper publishers Window Media, LLC ("Window") and Unite Media, LLC ("Unite") were founded in 2001. Def.'s Statement of Material Undisputed Facts at ¶ 1 [Doc. 25] ("DSOF"). Window was governed by the Amended and Restated Operating Agreement of Window Media LLC, dated May 16, 2001. Pl's Statement of Material Undisputed Facts at ¶ 8 [Doc. 18] ("PSOF"). Unite was governed by the Amended and Restated Operating Agreement of Unite Media LLC, dated December 15, 2003. Id. at ¶ 9.
Window and Unite were financed by Avalon Equity Fund, L.P. ("Avalon"). DSOF at ¶ 2. Avalon funded similar small business companies in markets throughout the United States. Id. Avalon held a controlling interest in both Window and *1352 Unite. PSOF at ¶¶ 10-11. Avalon was owned by David Unger and Benjamin Brandes. DSOF at ¶ 3. Avalon was licensed by the Small Business Administration ("SBA") as a Small Business Investment Company. Id. at ¶ 4. As such, it received $38 million in financing from the SBA to invest in its portfolio of small businesses. Id. Avalon was operated independently of Window and Unite. Id. As part of its arrangement with the SBA, if Avalon ever failed to maintain adequate reserves, the SBA could ask a federal court to appoint a receiver over Avalon. Id. at ¶ 5.
Plaintiff was hired as the Chief Financial Officer of Window and Unite in November 2005. Id. at ¶ 5. Plaintiff had a bachelor's degree in accounting and was a Certified Public Accountant. Id. He had previously worked for a major accounting firm and as a corporate controller for other companies. Id.
Due to an economic downturn, Avalon was not able to maintain the reserves required by the SBA and upon request of the SBA, on August 18, 2008, the United States District Court for the Southern District of New York signed a Consent Order of Receivership and took exclusive jurisdiction over Avalon, appointing the SBA as Receiver. Id. at ¶ 9. The goal of the SBA Receiver was to marshal and liquidate all assets of Avalon and to satisfy the claims of creditors. Id. at ¶ 10. David Unger and Benjamin Brandes were dismissed as officers and directors of Avalon in the same Consent Order. Id. at ¶ 6. With those individuals gone, as a matter of corporate succession, Plaintiff became Co-President of Window and Unite while Michael Kitchens became Chief Operating Officer of the entities. Id. After medical leave, Plaintiff returned to Window and Unite in March 2009. Id. at ¶ 7.
The SBA Receiver retained Avalon's pre-receivership rights as majority shareholders of the small business companies, including Window and Unite, but did not exercise voting rights over the Board of Directors of Window and Unite. DSOF at ¶ 12. Brian Stern was appointed as principal agent of the SBA Receiver for Avalon Equity in August 2008. Id. at ¶ 13. He administered the Receivership including facilitating potential sales of Window and Unite. Id.
Mr. Stern testified that the SBA Receiver was the majority stockholder of Avalon and had ownership interest in Unite and Window, but it "did not step into the shoes of any of the officers or directors of these two [companies], nor did it direct-contrary to what has been alleged, the receiver never directed the operations of Window or Unite." See Stern Depo. at 7, 13-14 [Doc. 20].[2] Mr. Stern further clarified that the SBA Receiver was actually a committee of three people-Thomas Morris, Director; Jerome Fowlkes, Financial Analyst; and Arlene Messinger, in-house attorney for the Receiver. Id. at 10. Mr. Stern acted as the agent for the Receiver committee. Id.
Prior to 2009 (with the exception of the 2001 tax year), Window and Unite were generally compliant with their payroll tax obligations. DSOF at ¶ 14. By the third and fourth quarters of 2009, Window and Unite had about 100 employees. Id. Plaintiff was aware that the companies were required to make payroll tax deposits. Id. at ¶ 15. Until about March 2009, both Window *1353 and Unite used a third-party payroll company, Netchex, to automatically process and remit payroll tax withholding to the IRS. Id. at ¶ 16. After March 2009, payroll tax deposits for Window and Unite were made manually. Id. Plaintiff learned that Window and Unite were no longer using Netchex when he returned from medical leave but did not take any action to change that. Id. at ¶ 17. Window and Unite did not use any special procedures to ensure payroll tax deposits were made or to segregate trust fund withholdings from general operational funds. Id. at ¶ 18.
Beginning in March 2009 through the end of 2009, Window and Unite failed to pay numerous payroll tax deposits and ran up substantial payroll tax debts. Id. at ¶ 19. A portion of the taxes are trust fund taxes which are owed by Window's and Unite's employees and withheld from their wages by the company and held in trust for the United States. Id.
Plaintiff participated in financial decisions for Window and Unite, such as signing and reviewing terms of a loan agreement in December 2007 in his capacity as Chief Financial Officer. Id. at ¶ 21. After the SBA Receivership began, Plaintiff continued to participate in financial decisions for both companies, including evaluating and making recommendations about offers to purchase Window and Unite. Id. at ¶ 22.
Plaintiff managed a three-person accounting staff and had the authority to change accounting policies and procedures for Window and Unite in conjunction with the Chief Executive Officer and other officers so as to effectuate major accounting changes. Id. at ¶ 23. During the time period at issue, Window and Unite did not use an outside accountant and all accounting functions were handled internally by Plaintiff and his staff. Id. at ¶ 24. Plaintiff prepared and filed Window's and Unite's Form 1065 partnership tax returns and Schedules K-1 from 2007 through 2009. He also prepared their Forms 1120. Id. at ¶ 25. During the third and fourth quarters of 2009, Plaintiff had signature authority over Window's and Unite's bank accounts and lines of credit, as well as a corporate credit card he used to pay vendors and other creditors. Id. at ¶ 26.
Mr. Stern testified that he did not have any responsibility for filing or paying taxes for Window or Unite. See Stern Depo. at 35. He testified that the Receiver "did not take over the operation, finances, the hiring, the firing, the publication, or any other aspect of either company." Id. at 35-36. Mr. Stern testified that the Receivership did not have the ability to file any tax returns or to make any tax decisions for Window or Unite. Id. at 36.[3]
Prior to the Receivership, Plaintiff's ordinary procedure for paying operating expenses was to review with his accounting staff invoices as they were received, enter them into the companies' QuickBooks programs, and pay bills. DSOF at ¶ 29. After May 2009, Plaintiff reviewed monthly financial reports which included cash flow and outstanding accounts receivable. Plaintiff periodically sent these reports to the SBA Receiver and Michael Kitchens, Chief Operating Officer of Window and Unite. Id. at ¶ 30. On several occasions during the third and fourth quarters of 2009, Plaintiff paid employee salaries out of his own funds. Id. at ¶ 31. Plaintiff filed annual financial reports for Window and Unite. Id. at ¶ 32. He also filed Limited Liability Company registrations for Window and Unite. Id. at ¶ 33. Plaintiff had the authority to hire and fire. Id. at ¶ 34. Plaintiff also had the authority as an officer of Window *1354 to decide whether to accept a Settlement Agreement related to a dispute with a Washington, D.C. landlord. Id. at ¶ 36 (citing [Doc. 23-18, Ex. 16] ).[4]
Window and Unite maintained a bank account with M & T Bank which was used for both payroll and operating expenses. Id. at ¶ 37. During the third and fourth quarters of 2009, Plaintiff regularly signed payroll checks from the Window and Unite M & T bank account, either by hand or with a signature stamp. Id. at ¶ 38. Plaintiff supervised the accounting staff of Window and Unite who wrote checks from the companies' M & T bank accounts to pay operating expenses and payroll. Id. at ¶ 39. As Chief Financial Officer for Window and Unite, Plaintiff maintained payroll records, including federal and state tax deposit withholding information. Id. at ¶ 40. Until 2007, Window's and Unite's quarterly payroll tax returns (Form 941) were prepared by an outside accountant. After that time, Plaintiff prepared and filed the Forms 941. Id. at ¶ 42. Plaintiff signed and delinquently filed Window's and Unite's Forms 941 for the third and fourth quarters of 2009 on January 28, 2010. Id. at ¶ 43. Plaintiff stated he was aware of the deadline, but did not timely file the forms "due to an oversight" caused by inadequate staffing in the accounting department. Id.
Plaintiff knew that Window and Unite were not remitting payroll tax deposits as early as May 8, 2009. Id. at ¶ 44. Plaintiff compiled detailed schedules of payroll tax withholding from both state and federal jurisdictions. On several occasions, Plaintiff provided these schedules to the SBA Receiver noting that the payroll tax withholdings were not being paid over in order to pay other operating expenses of Window and Unite. Id. at ¶ 45. During the third and fourth quarters of 2009, Plaintiff continued to be aware that withheld payroll taxes were not being paid over the IRS in order to pay other operating expenses, such as payments to drivers, printers, and employees. Id. at ¶ 46. He testified that the "payroll taxes could have been paid" but then the "companies would have been shut down. The critical vendors would not have been paid, so taxes could have been paid." See Myers Depo. at 53 [Doc. 21].
Plaintiff was concerned about the possibility that he would face personal liability as a result of his failure to remit Window's and Unite's withheld payroll taxes to the IRS. See DSOF at ¶ 47. On October 14, 2009, Plaintiff stated he was concerned about his liabilities because "certain decisions have been made" in order to keep the businesses open until a buyer could be found. Id. In October 2009, Plaintiff sought and obtained legal counsel in anticipation of these liabilities. Id. Plaintiff and the Board of Directors for Window and Unite obtained outside counsel and filed a petition for bankruptcy under Chapter 11 on November 13, 2009. Id. at ¶ 49. The SBA Receiver was not involved in the decision to file bankruptcy, first learned of the bankruptcy after the petition had been filed, and was informed by Plaintiff that Window and Unite would wind up and close their offices. Id. at ¶ 50.
On January 4, 2014, a delegate of the Secretary of the Treasury assessed trust fund penalties with respect to Unite Media, LLC against Steven Myers pursuant to 26 U.S.C. §§ 6671 and 6672 for the tax period September 30, 2009 in the amount *1355 of $98,558.17 and for the tax period December 31, 2009 in the amount of $30,592.59. Id. at ¶ 51. Notice of the tax assessments and demands for payment were made on Steven Myers as provided by law. Id. at ¶ 52. Plaintiff has not paid the assessments and there remains due and owing $193,276.45 on the assessments with accruals computed to May 8, 2017. Id. at ¶ 53.
Window filed its Forms 941 for the third and fourth quarters of 2009 on January 31, 2010 and February 6, 2010. See PSOF at ¶ 1. The IRS proposed a trust fund assessment against Plaintiff for Window's payroll taxes for the third and fourth quarters of 2009. Id. at ¶ 3. Plaintiff filed a timely protest of the proposed trust fund penalty assessment against him. Id. at ¶ 3. There was no final administrative determination of the protest by February 6, 2013. Id. at ¶ 4. A Form 5402 concerning Plaintiff's protest was signed by an IRS appeals manager on December 9, 2013. Id. at ¶ 5. On January 8, 2014, the IRS assessed the trust fund penalty against Plaintiff. Id. at ¶ 6.
Because so much of Plaintiff's defense in this case concerns the instructions he claims he received from Mr. Stern as agent for the SBA Receiver, the Court finds it necessary to consider in detail the testimony Plaintiff provided about his interactions with Mr. Stern. Plaintiff and counsel for Defendant engaged in a lengthy colloquy concerning what instructions Plaintiff received concerning taxes.
Q: And so you say that was being told that once you got-either an add-on investment from the SBA or liquidated the companies, you would be able to take care of the payroll tax liabilities?
A: Yes.
Q: Who told you that?
A: Initially, it was David Unger and then when David Unger left, it was Brian Stern.
Q: So Brian Stern told you that the payroll tax liabilities could be put off until one of these two things occurred?
A: He told me that the critical vendors were the printers, the drivers and employees. And the payroll taxes would be settled and satisfied when we-when they were able to sell the assets or we were able to get a bridge financing loan.
Q: Did he ever tell you not to pay the payroll tax liabilities?
A: He never told me not to pay the critical vendors first.
Q: So Mr. Stern told you to pay critical vendors in order to keep operations going?
A: Correct.
Q: Did he tell you to do what you could to keep the boat afloat?
A: He basically did. Yes.
Q: So did you interpret that as being-pay those instead of the payroll tax liabilities?
A: No. His boat afloat was robbing Peter to pay Paul and Paul was the critical vendors.
Q: And who is Peter?
A: Everyone else.
Q: Did he ever-so did he specifically direct you to not pay the IRS the withholding and the employment tax liabilities that had been unpaid?
A: I cannot tell you he ever said "do not pay those," but he told me the critical vendors were these vendors and that's who we'd pay.
And I would say, What about the payroll taxes?
*1356 We'll take care of that when we liquidate the assets or get the bridge financing.
Q: When did he tell you that?
A: A number of times from the time he and I started interacting together, which would have been after Mr. Unger left through late September/early October. Prior to that Mr. Unger was telling me that.
Q: So before September, Mr. Unger told you-did Mr. Unger tell you-
A: Before July, Mr. Unger-Mr. Unger looked at this as getting 90 days of extra float.
Q: Extra float being extra liquidity to keep the companies afloat?
A: Yes.
Myers Depo. at 69-71. The conversation continued later:
Q: So the receiver was-you're saying the receiver was making day-to-day operational decisions about Window and Unite Media?
A: They were involved in operational matters. Yes.
Q: Were they involved so that the companies in terms of marshaling the assets and liquidating the companies like you talked about before?
A: They were involved in that. Yes.
Q: Did they make day-to-day decisions about the operations of the companies?
A: They were involved in day-to-day decisions.
Q: What day-to-day decisions were they involved in?
A: What vendors to pay. They were getting weekly forecasts, including information related to the vendors. So when payroll tax liabilities were showing and there was another one coming up, it was brought to his attention.
Q: So it was brought to Brian Stern's attention-
A: Yes.
Q: -that payroll tax liabilities had not been paid?
A: Correct.
Q: And it was brought to his attention what vendor liabilities were out there?
A: Correct.
Q: And you're testifying that he instructed you not to pay the payroll tax liabilities?
A: He instructed me to pay the critical vendors, the printers, the drivers and the employees; and the other assets-when the assets were sold or the bridge loan would be received, we will take care of the other liabilities, including payroll taxes.
Q: And, again, so do you remember when he said that?
A: I had so many conversations with him almost daily on different matters. I couldn't tell you exactly what dates.
Q: Was this ever put in writing?
A: Did he ever put that in writing? No. But he received from me information on vendor and cash requirements.
Q: Mm-hmm.
A: He never put it in writing to me, but he may have put it in writing to his bosses.
Id. at 77-78. Additionally, Plaintiff testified:
Q: What I'm asking is-you just said that you assumed that the SBA as an agency of the United States government somehow had authority to direct or suggest the company's actions with payment of taxes; is that accurate?
A: Well, I guess in the same-why didn't they say these needed to be paid?
Q: Do you have any-did they ever tell you that they had to be paid?
A: One time I was told I needed to sharpen my pencil.
Q: Who told you that?
*1357 A: Brian Stern. One time out of how many E-mails and how many cash reports did he receive that I-was I told to sharpen my pencil, to get it paid. And that was at the end of June.
Q: When he said that, sharpen your pencil to get it paid, that was to get these tax liabilities paid?
A: Something-I needed to do something. He was saying something had to happen in order to look and get those paid. So when the next cash report came out and he saw they didn't get paid, he didn't say, Sharpen the pencil, Steve; get those paid. He said, Pay the drivers, pay the employees and pay the printers.
Q: He said that on a phone call.
A: He did.
See Myers Depo. at 96-97.
B. Contentions
Plaintiff argues that the Government's assessment of payroll penalties against Window is untimely because it was outside the three year statute of limitations period under 26 U.S.C. § 6501(a). Plaintiff also denies that he was (1) a responsible person (2) who willfully failed to pay the payroll taxes because he asserts that the SBA Receiver directed him to pay critical vendors before the payroll taxes. Plaintiff contends that once Avalon was put into receivership, the Receiver was the only one with the power and authority to control Avalon, as well as Window and Unite, in which Avalon held a controlling interest. Because Plaintiff did not have any authority or control to decide which creditor to pay, he avers he cannot be a "responsible person."
The Government contends that Plaintiff was both a responsible person and willfully failed to pay the payroll taxes because Plaintiff had the responsibility for collecting, accounting for, or paying the taxes withheld from Window's and Unite's employees. Plaintiff was aware of the fact that the trust fund taxes were not being paid and despite that knowledge, paid other creditors first. The Government asserts that the SBA Receiver took over Avalon, but did not take over the day-to-day operations of Window and Unite so as to either relieve Plaintiff of his status as a "responsible person" or provide him any defense for not assuring that the payroll taxes were remitted to the IRS.
II. Discussion
The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. Id. The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. Id. at 249, 106 S.Ct. 2505.
When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving *1358 party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. Id. at 324-26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52, 106 S.Ct. 2505.
The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. Am. Bankers Ins. Group v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. Id.
The Court first addresses Plaintiff's contention that the imposition of the tax is outside the three year limitations period under 26 U.S.C. § 6501(a). The parties agree that the final administrative determination in this matter occurred on December 9, 2013. Title 26 U.S.C. § 6672(b)(3)(B) extends the three year period in these circumstances and explains that the limitations period "shall not expire before the later of-(A) the date 90 days after the date on which [a notice of proposed assessment] was mailed or delivered in person, or (B) if there is a timely protest of the proposed assessment, the date 30 days after the Secretary makes a final administrative determination with respect to such protest." Id. Here, there was a timely protest and the final administrative determination occurred on December 9, 2013. Thirty days after December 9, 2013 is January 8, 2014. Plaintiff contends that the assessment was then due on January 7, 2014, because the limitations period would expire on January 8, 2014.
The Court does not find support for Plaintiff's position in either the text of the statute itself or case law applying it. Section 6672(b)(3)(B) states that the limitations period extends to the later of 90 days after the proposed assessment was mailed or delivered or "the date 30 days" after the final administrative determination. The "date 30 days" after the determination here is January 8, 2014, such that any penalty imposed up to and including January 8, 2014 is timely. See also Glass v. United States, 335 F.Supp.2d 736, 740-41 (N.D. Tex. 2004) ("When a taxpayer protests a proposed assessment of a penalty, section 6672(b)(3) provides that the statute of limitations for the Government to make a final assessment of the penalty is 30 days after the Secretary makes a 'final administrative determination' with respect to the protest.... [in this case] the Government had 30 days from June 3, 1998 (that is, until July 3, 1998) to make a final penalty assessment.") (emphasis added), amended in part on other grounds, 2004 WL 2189634 (N.D. Tex. Aug. 26, 2004). For the foregoing reasons, the Court finds that the tax was imposed within the limitations period. The Court now turns to the substance of the parties' disputes concerning the tax liability.
Under the current tax scheme, employers are required to withhold income and social security taxes from employees' wages and those monies are considered to be held in a "trust fund" for the benefit of the United States. See 26 U.S.C. §§ 3102(b), 3403, & 7501(a). At the time those funds are collected, they no longer belong to the employer, but rather are held in trust for the United States. Howard v. United States, 711 F.2d 729, 733 (5th Cir. 1983).
*1359 While the taxes are withheld as soon as the employee's wages are paid, they are not immediately paid to the Government. The employer reports the amount of withheld taxes on a payroll tax return (Form 941). 26 C.F.R. § 31.6011(a)-4(a)(1). A Form 941 must be filed every calendar quarter and is due on the last day of the first month following the quarter. Id. § 31.6071(a)-1(a). When an employer fails to properly collect and remit those taxes, the Internal Revenue Service assesses a Trust Fund Recovery Penalty ("TFRP") which is a statutory means by which the IRS pursues collection of these funds.
In the event that the payroll taxes are not remitted to the Government, Title 26 Section 6672 imposes liability upon (1) a responsible person (2) who has willfully failed to perform a duty to collect, account for, or pay over federal employment taxes. Thosteson v. United States, 331 F.3d 1294, 1298 (11th Cir. 2003).[5] Section 6671(b) defines "person" to include "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." Id. A company can have more than one responsible person. Id. at 1300. The burden of proof is on the taxpayer to show that he is not a "responsible person" and he did not act "willfully." Morgan v. United States, 937 F.2d 281, 285 (5th Cir. 1991).
In Scott v. United States, the Eleventh Circuit explained:
We have interpreted the statute broadly, Smith v. United States, 894 F.2d 1549, 1553 (11th Cir. 1990), and have stated that responsibility is "a matter of status, duty, and authority." Mazo v. United States, 591 F.2d 1151, 1156 (5th Cir. 1979). We have further stated that "[i]ndicia of responsibility include the holding of corporate office, control over financial affairs, the authority to disburse corporate funds, stock ownership, and the ability to hire and fire employees." George v. United States, 819 F.2d 1008, 1011 (11th Cir. 1987). The essential question is whether the person had sufficient control over corporate affairs to avoid non-payment of the employment taxes. Id.
825 F.3d 1275, 1279 (11th Cir. 2016) (footnote omitted). Cases considering a "responsible person" are necessarily "fact-intensive." Id.
The Court further surveyed the landscape of cases considering liability for "responsible persons." In Thosteson, for example, the alleged responsible person "helped incorporate the company, served as both vice president and president, owned initially 24 percent and then 100 percent of the stock, and possessed the authority to hire and fire." Id. The person "was able to write checks without a cosigner up to $750" and "was especially knowledgeable about the payment of withholding taxes because the company provided employee leasing, explicitly offering the service so that the leasing employer would not have to handle withholding taxes." Id.; see also Williams v. United States, 931 F.2d 805, 810 (11th Cir. 1991) (taxpayer was responsible person when he was president and chief operating officer, had check-writing authority, owned 50 percent of corporation during one quarter at issue and 100% during other, and had control *1360 over and supervised all of corporation's daily operations); Mazo, 591 F.2d at 1155-56 (taxpayers were all director-officers-stockholders or their manager, who all had authority to sign checks on regular business account and complete control of affairs of company and manager signed most of checks from payroll and salvage account); Brown v. United States, 591 F.2d 1136 (5th Cir. 1979) (holding taxpayers were responsible because they managed daily operations of corporation, owned half of stock, had check-writing authority, and personally guaranteed corporation's debts).
The Scott Court also reviewed several decisions from the Eleventh Circuit considering the defense taxpayers who alleged that they had been directed not to pay the tax. The Court noted that:
[c]ases have rejected the taxpayers defense that they lacked responsibility for paying the taxes because they had been directed by the company's owner not to pay them. In Roth v. United States, 779 F.2d 1567 (11th Cir. 1986), the taxpayer was executive vice president, hired employees, signed payroll checks, paid most of the bills, had signature authority on all of the company's checking accounts, signed for the company's mortgage, had an option to buy up to 50 percent of the corporate stock, made contracts, and handled the company's day-to-day operations. Id. at 1569. He asserted that Dobbins, the chief executive officer, president, and majority owner, had ordered him not to the pay the withholding taxes to the government, stripping him of responsibility. We rejected this defense. Although the district court had reasoned that using the corporation's funds contrary to the president's instructions was tantamount to embezzlement, we rejected that argument because the funds were held in trust for the government and no longer belonged to the company. Id. We held in Roth:
Roth once having become an "otherwise responsible person" to pay over the taxes became obligated by statute to pay these funds to the Internal Revenue Service. He was under no obligations to obey instructions from his corporate supervisor not to do so.
Id. at 1572.
825 F.3d at 1280.
In another case, Thibodeau v. United States, 828 F.2d 1499 (11th Cir. 1987), where the taxpayer was responsible for selling and securing contracts, running the office, arranging for financing, directing the bookkeeper of the company to draw checks, and he had check-signing authority, the Court rejected the taxpayer's argument that he was not a responsible party because he was controlled by the owner of the company who told him to "keep the corporation running and pay the wages and debts." Id. at 1502-04. The Court found that the taxpayer "knew more about the daily operations of the corporation because he was the one on-site" and had the requisite authority. Id. at 1504-05. In Scott, however, the Court found that there was a question of fact as to whether the taxpayer was a "responsible party" because a reasonable jury could conclude from the evidence in the record that the taxpayer did not have the authority to decide which bills to pay, had only a clerical roll in payroll, and could only issue checks within certain parameters. 825 F.3d at 1281.
The "willfulness" prong of section 6672 is "satisfied if the responsible person has knowledge of payments to other creditors after he becomes aware of the failure to remit the withheld taxes." Thosteson, 331 F.3d at 1300. "Willfulness" does not "require a fraudulent or other bad motive on the part of the responsible person." Id. (quotation and citation omitted); see also Thibodeau, 828 F.2d at 1505 ("The willfulness *1361 requirement is met if there is evidence that the responsible officer had knowledge of payments to other creditors after he was aware of the failure to remit the withheld taxes" or if the responsible person shows "reckless disregard of a known or obvious risk that trust funds may not be remitted to the government."); Smith v. United States, 894 F.2d 1549, 1553 (11th Cir. 1990) (same).
It appears that binding authority in the Eleventh Circuit has incorporated consideration of "reasonable cause" into the definition of "willfulness." See Newsome v. United States, 431 F.2d 742, 746-47 (5th Cir. 1970).[6] The Court noted, however, that "reasonable cause" should have a "very limited application." Id. at 747. Without precisely defining the scope of "reasonable cause," the Court held that advice from accountants and counsel did not constitute "reasonable cause" for the failure of the taxpayer to pay over the withheld taxes. Id."In urging [the taxpayer] to execute a chattel mortgage on certain [ ] equipment in order to renew a note, the attorney did not advise [the taxpayer] that he could prefer the bank over the United States without subjecting himself to section 6672 liability." Id. at 748.[7]
The Court finds that the undisputed facts in the record clearly show that Plaintiff was a "responsible person." He was Chief Financial Officer of Window and Unite. He had control over the corporations' financial affairs with the authority to disburse funds. As a certified public accountant and a comptroller for other companies, Plaintiff had the financial sophistication to understand the nature of the payroll tax deduction and trust fund system. He was responsible for making the tax filings of Window and Unite. He had the authority to hire and fire. Plaintiff played an important role with the other corporate officers in making financial decisions, especially as Window and Unite had increasing business problems, including signing and reviewing the terms of $750,000 and $500,000 loans with M & T Bank. He also gave final approval-at the request of Brian Stern-for a settlement agreement regarding litigation with the landlord of the companies' Washington, D.C. office space.
After David Unger left Avalon on July 15, 2009, Plaintiff became Co-President of Avalon and Chief Financial Officer of Window and Unite. He managed a three person accounting team which handled payments to Window's and Unite's payments to creditors and vendors. The accounting staff had to prepare and file tax returns for Window and Unite. Plaintiff, himself, signed the companies' Form 941 quarterly tax returns. Plaintiff had the authority to write checks and disburse funds. Because Window's and Unite's payroll tax withholdings were never segregated from their general operating funds, Plaintiff had the ability to pay the payroll taxes from those funds because he had the check writing authority over those funds. Finally, Plaintiff, along with the other corporate officers of Window and Unite-and without the knowledge, input, or approval of the SBA Receiver-made the decision to place Window and Unite into bankruptcy.
*1362 With respect to "willfulness," Plaintiff certainly knew that Window and Unite were not paying their payroll taxes as early as May 8, 2009. He provided other corporate officers and the SBA Receiver with records showing that Window and Unite had unpaid payroll tax withholdings. And Plaintiff regularly made payments to other creditors such as vendors, printers, drivers, and other employees instead of setting aside the payroll taxes. Plaintiff understood the gravity of the situation because he was concerned about his personal liability for the taxes. This would appear to establish willfulness as a matter of law, but Plaintiff argues that he had reasonable cause for his failure because he claims he was directed by the SBA Receiver to not pay the taxes.
Essentially, Plaintiff's argument boils down to (1) the SBA Receiver told him not to pay the taxes and (2) he had to follow the instructions of the Receiver because the Receiver was an arm of the federal government. The Court extensively recited above Plaintiff's testimony concerning instructions he was given by Brian Stern, the principal agent for the SBA Receiver. Even Plaintiff's own testimony; however, shows that Mr. Stern never gave him an explicit instruction not to pay the taxes, although there is no dispute that Mr. Stern was at least aware of the fact that the payroll taxes were not being remitted to the Government at the same time that certain creditors and vendors were being paid. At most, Plaintiff testifies that Mr. Stern suggested as much because he told Plaintiff that he needed to "sharpen his pencil" and find the money somewhere as Mr. Stern wanted the businesses to operate as long as they could in order to facilitate a sale to a third party. As such, the Court finds there is no evidence in the record from which a reasonable jury could conclude that the SBA Receiver explicitly instructed Plaintiff not to pay the taxes.
Even if the Court were to find that a reasonable jury could determine that Mr. Stern's instructions were close enough to an order not to pay the payroll taxes, that does not mean that Plaintiff is no longer a "responsible person" under the statute. First, the Court finds no evidence in the record to support Plaintiff's claim that the SBA Receiver is an arm or agency of the federal government. The authority of the SBA Receiver stems from the Consent Order entered by the United States District Court for the Southern District of New York, not any executive branch agency. See Consent Order [Doc. 18, Ex. 9]. The Consent Order applies to Avalon only. The terms of the Order state that the Receiver is appointed for the purpose of "administering, marshalling and, if necessary, liquidating all of Avalon's assets to satisfy the claims of creditors, therefrom in the order of priority as determined by this Court." Id. at ¶ 1. The Receiver "shall have powers, authorities, rights and privileges heretofore possessed by the general partners, managers, officers, and directors of Avalon under applicable state and federal law." Id. at ¶ 2.
Plaintiff argues that he lost all power to do anything when the Receiver was appointed but the undisputed facts show otherwise. While it is true, as Plaintiff argues, that Avalon holds a majority interest in Window and Unite and thereby has certain voting rights with respect to the Board of Directors of Window and Unite, these rights say nothing about the day-to-day operation of Window and Unite. The undisputed testimony is that Plaintiff and the other corporate officers and staff of Window and Unite continued in their roles and continued to run the companies on a day-to-day basis even after the appointment of the Receiver. In Receivership, Plaintiff continued to direct the accounting staff of Window and Unite, he filed tax returns for the corporation, and signed checks, including *1363 to vendors and employee payroll. None of those responsibilities was removed from his authority when the Receiver arrived. The fact that illustrates this reality most dramatically is that Plaintiff and the other corporate officers of Window and Unite voted to enter bankruptcy without even notifying or seeking any input from the SBA Receiver.[8] It was Plaintiff's view alone that the SBA Receiver was speaking with the voice of the United States Government. No person on behalf of the Receivership ever indicated so to Plaintiff. See Morris Depo. at 71.[9]
Second, as the survey of Eleventh Circuit case law above demonstrates, the Court is unimpressed with arguments that "my boss told me not to pay the taxes." See Thosteson, 331 F.3d at 1300 ("Acting, or rather failing to act, under orders from his superior does not negate his culpability under the statute."); Thibodeau, 828 F.2d at 1499 (describing Roth as case which "hold[s] that an otherwise responsible person cannot be relieved of this obligation when directed by another person not to pay the taxes"); Roth, 779 F.2d at 1572 (once taxpayer became "responsible person," he was obligated by statute to pay these funds to IRS despite specific instructions from his corporate president to the contrary and rejecting district court's analysis that failure to follow instructions of corporate president was tantamount to embezzlement).
Similarly, in Commonwealth National Bank of Dallas v. United States, 665 F.2d 743 (5th Cir. 1982), the taxpayer asserted that the Bank had taken over all of the corporation's financial decision-making duties and, thus, he could not be a responsible person. Id. at 747. The Court rejected this argument and held if the Bank "exercised exclusive control over which creditors ... were to be paid and when, it remains the case that [taxpayer] permitted [the company] to continue in business and to use trust funds collected on behalf of the United States to pay other creditors...." Id. at 748. Based on this authority, the Court finds that Plaintiff cannot excuse his failure as a "responsible person"
*1364 based on instructions he received from another.
Finally, Plaintiff also appears to contend in so many words that if he is a responsible person, then Brian Stern should be one as well. That may or may not be true; but the case law is clear that there can be more than one "responsible person" in a corporation. See, e.g., Thibodeau, 828 F.2d at 1503 ("It is undisputed that more than one person may be a responsible officer of the corporation under § 6672."; Gephart v. United States, 818 F.2d 469, 476 (6th Cir. 1987) ("While it may be that [another corporate officer] w[as] more responsible than plaintiff, and exercised greater authority, this does not affect a finding of liability against plaintiff.") (emphasis in original).
The Court understands Plaintiff's position that there were no easy answers in this situation and he was caught between a rock and a hard place, but that was the same position the taxpayer in Roth was placed and the Court still found that he was a responsible person. For the foregoing reasons, the Court denies Plaintiff's motion for summary judgment [Doc. 18] and grants Defendant's motion for summary judgment [Doc. 23].
III. Conclusion
The Court DENIES Plaintiff's Motion for Summary Judgment [Doc. 18] and GRANTS the United States of America's Motion for Summary Judgment [Doc. 23].
The Court DISMISSES WITH PREJUDICE Plaintiff's Complaint for refund. The Court DIRECTS the Clerk of the Court to enter judgment in favor of Defendant and against Plaintiff in the amount of $193,276.45, representing the trust fund recovery penalties assessed against Plaintiff for the third and fourth quarters of 2009 as of May 8, 2017.
SO ORDERED , this 8th day of February, 2018.

The Court notes that although the docket of this case refers to Plaintiff as "Steven J. Meyers," the parties spell Plaintiff's name as "Steven J. Myers."

Plaintiff objects to Mr. Stern's testimony as merely his opinion and legal conclusions regarding the day-to-day operations of Window and Unite. See Pl.'s Resp. to Def.'s SOF at ¶ 11 [Doc. 25]. The Court disagrees. Mr. Stern's testimony here clearly is fact testimony about what actually happened with the Receivership and not any opinion of his about what the Consent Order establishing the Receivership stated.

Plaintiff, again, objects that these are Mr. Stern's legal opinions. See Pl.'s Resp. to DSOF at ¶ 27. The Court disagrees. Mr. Stern is clearly testifying as to his recollection about what happened in this case.

Plaintiff disputes this statement of fact saying that the evidence supporting it showed only the "procedure" to be used in settling the dispute. The Court disagrees. Exhibit 16 is an email discussion between Brian Stern and Plaintiff stating that Window had the authority to decide whether to settle or not and that Window should notify the Receiver as to which decision it made.

Title 26 U.S.C. § 6672 provides:
Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

The Court recognizes that Thosteson remarks that the Eleventh Circuit has not yet determined whether a "reasonable cause" defense exists for the willfulness prong. 331 F.3d at 1301. See Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997) (explaining prior panel precedent rule).

Plaintiff points to the deposition testimony of Steve Klahn, a member of the accounting staff for Window and Unite, to show that Mr. Stern took control of all of the companies when he arrived as agent for the Receiver. See Pl.'s Resp. at 3 [Doc. 26]. However, Mr. Klahn never testified that Mr. Stern was in charge of Window and Unite. He does state that he believed Mr. Stern to have control the way a banker would have control. See Klahn Depo. at 29 [Doc. 24]. He states that he was on conference calls with Mr. Stern and Mr. Unger when financial issues were discussed, including whether any employees could delay taking a paycheck. Those were group discussions and Mr. Klahn never testified that Mr. Stern was in charge of those decisions. Id. at 24-33. Similarly, the deposition testimony of Michael Kitchens shows Mr. Stern as a "boss" in the same manner that a president or chief executive officer would be, but not to the exclusion of any other corporate officer. See Kitchens Depo. Excerpts [Doc. 26, Exs. 3, 4, 7, 8]. The Court notes Plaintiff did not file the complete deposition transcript for Michael Kitchens.

The case which Plaintiff describes as "most favorable" is his position, [Doc. 18-2 at 12], is not helpful. In Jones v. United States, 60 F.3d 584 (9th Cir. 1995), the receiver essentially removed all personnel of the corporation and then refused the advice of the taxpayer that the payroll taxes needed to be paid first. Here, the corporate officers of Window and Unite continued in their roles. Similarly, the Court does not find McCarty v. United States, 437 F.2d 961 (Ct. Cl. 1971), to be helpful for Plaintiff. There, the IRS agreed not to collect taxes owed by a corporation and allowed the corporation to continue operating to complete performance of a contract the corporation had with the Navy. Id. at 974. Because the IRS had made this agreement, the Court found that the IRS could not charge individual corporate officer with liability for delinquent payroll taxes. Id. No such agreements were made here.